# EXHIBIT 1

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| BH SECURITY, LLC d/b/a BRINKS HOME SECURITY, <br><br> Plaintiff, <br><br> v. <br><br> ADT INC. and ADT LLC, <br><br> Defendants. | C.A. No. 2025-_____-___ |

## VERIFIED COMPLAINT

### YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE COURT OF CHANCERY OF THE STATE OF DELAWARE

**If you are not authorized to view this document under Rule 5.1 or by Court Order, read no further than this page and contact the following person(s):**

Garrett B. Moritz (Bar No. 5646)
Roger S. Stronach (Bar No. 6208)
ROSS ARONSTAM & MORITZ LLP
Hercules Building
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600

*Attorneys for Plaintiff BH Security LLC d/b/a Brinks Home Security*

**A public version of this document will be filed on or before September 30, 2025.**

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

| | |
|---|---|
| BH SECURITY, LLC d/b/a BRINKS HOME SECURITY, | |
| Plaintiff, | |
| v. | C.A. No. 2025-_____-___ |
| ADT INC. and ADT LLC, | |
| Defendants. | |

## VERIFIED COMPLAINT

Plaintiff BH Security LLC d/b/a Brinks Home Security ("Brinks Home"), by and through its undersigned counsel, upon personal knowledge as to its own actions, and upon information and belief as to all other matters, alleges as follows against ADT Inc. and ADT LLC (collectively, "ADT"):

## NATURE OF THE ACTION

1.      Brinks Home is one of the country's leading home security companies with more than 700,000 residential subscribers in the U.S.  Over the past five years, it has invested tens of millions of dollars in developing a suite of proprietary processes to leverage artificial intelligence and machine learning ("AI/ML") to improve customer experience and retention.  Long before AI/ML became a hot topic in mainstream media and while others in the home security industry were almost exclusively focusing on how to deploy AI solutions in their hardware (i.e., the alarm systems and cameras installed in customers' homes), Brinks Home was focused on

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

integrating AI/ML software into the back-end systems it used to run its business for the purpose of improving customer service, expanding margins, and improving customer retention.

2.      This proprietary digital strategy was known as "Go Fast" and it helped Brinks Home dramatically improve customer retention and satisfaction metrics while reducing its cost-to-serve, all of which, in turn, improved the bottom line. This effort was so successful that, in March 2022, Brinks Home was featured prominently in a Harvard Business Review article discussing cutting-edge customer service strategies being developed by various companies.[1] However, even as the high-level concept of Brinks Home's Go Fast strategy was winning widespread praise, the precise methodologies and operational details of Go Fast remained confidential and closely guarded even within Brinks Home.

3.      ADT is the largest home security company in the U.S., but in recent years has failed to capitalize on advances in AI/ML designed to improve customer experience, predict customer churn, and optimize pricing. Instead, ADT has spent over a billion dollars on a series of strategic initiatives that failed to deliver a return on invested capital, increase its subscriber base, or increase its share price. Despite its market position, its stock is down almost 50 percent from its initial public offering

---

[1] David C. Edelman & Mark Abraham, *Customer Experience in the Age of AI*, HARV. BUS. REV. (Mar.-Apr. 2022).

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

and over the past five years has significantly lagged behind the S&P 500 returns (-26% vs. ~91%).

4.　　In a bid to make up for its failed strategic initiatives, lost time, and opportunity costs, ADT has relied on a range of unlawful business practices directed at its competitors. This lawsuit seeks to hold ADT accountable for its efforts to improve its profitability by stealing information from Brinks Home. ███████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████

5.　　███████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████

6.　　███████████████████████████

████████████████████████████████████

██████████████ ███████████████████

████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

7.

8.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

█████████████████████████████████████████████

██████████████████████████

9.      ADT has a long history of misusing confidential information. It routinely recruits Brinks Home's sales representatives and authorized dealers with the goal of encouraging them to misappropriate Brinks Home's proprietary and closely-guarded customer lists and account information. This willingness to obtain and abuse competitors' confidential information appears to be systemic at ADT and culminated in the deliberate misuse of Brinks Home's confidential information gathered during the ████████████████████████████████

██████████████████

10.      ADT's management is no doubt under pressure from its investors unhappy about ADT's stock price performance, consumers unhappy about repeated data breaches, and business partners that have yet to realize any return on their investment in ADT—but that does not give ADT license to steal and use competitor proprietary information to obtain an unfair advantage in the marketplace. ADT is not above the law, and its pattern of unlawful conduct must end. This lawsuit seeks to enforce Brinks' Home's contractual rights ██████████████████████ and hold ADT accountable for its systemic misappropriation of Brinks Home's trade secrets, which ADT has illegally used to obtain very substantial and ill-gotten profit.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

## PARTIES

11.     Plaintiff BH Security, LLC d/b/a Brinks Home Security is a Delaware limited liability company with its principal place of business located at 1990 Wittington Place, Farmers Branch, Texas 75234.

12.     Defendant ADT Inc. is a Delaware corporation whose common stock trades on the New York Stock Exchange under the symbol ADT and has its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431.

13.     Defendant ADT LLC is a Delaware limited liability company with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431. ADT LLC is owned by Defendant ADT Inc. ADT is an operating company that runs ADT's alarm services business in the United States. ADT Inc. describes ADT LLC as "our main operating entity."

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over ADT because ADT is organized under the laws of the state of Delaware and because ADT consented to the jurisdiction and venue of this Court █████████████████████████

████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

## FACTUAL ALLEGATIONS

**A.   Brinks Home Devotes Substantial Resources To Developing Cutting Edge Data Science And Technology Programs**

15.   For several decades, Brinks Home and its predecessors have been a leading provider of home security equipment and monitoring services to over 700,000 customers throughout the United States, with a proven track record of offering customers powerful home security solutions with innovative technology and reliable professional services.  Brinks Home has been repeatedly recognized as an industry leader in customer satisfaction.  For instance, in 2025, Brinks Home was recognized as one of the top-ranked companies in USA Today's Best Customer Service survey and it has repeatedly received other similar recognition including high rankings in J.D. Power's annual customer satisfaction survey and Newsweek's America's Best Customer Service survey.

16.   ADT is the oldest and largest security alarm company in the United States.  ADT's filings with the U.S. Securities and Exchange Commission note that Brinks Home is one of its several principal competitors.

17.   ADT and Brinks Home are two of the largest players in the intensely competitive and constantly evolving U.S. home security industry, and they are among the several companies that market and sell substantially similar goods through similar channels to generally the same target markets of residential consumers throughout the United States.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

18.     Given the competitive nature of the U.S. home security industry, customers often elect to switch service providers when they are dissatisfied with their current provider or believe they can get a better deal with a competitor.  Thus, attracting and retaining customers is vital to business success within the industry, and any company that can develop strategies and systems to maximize customer retention while minimizing costs would gain a considerable edge over its competitors.   As a result, Brinks Home has prioritized developing proprietary strategies to identify customers most likely to leave Brinks Home and provide offerings most likely to prevent a customer from leaving Brinks Home, and also design methods to leverage AI/ML to resolve customer queries more quickly and increase customer satisfaction during the servicing of customers.  Through five years of effort and investment of tens of millions of dollars, Brinks Home ultimately developed its Go Fast program, representing a major innovation in how home security businesses could attract and retain customers.

19.     Brinks Home has used the Go Fast program to dramatically reduce costs and improve profitability in ways other home security competitors have been unable to emulate.  At its core, Go Fast involved creating a large data warehouse (sometimes referred to as a "data lake"), customizing and leveraging several artificial intelligence platforms and then threading ███████████████████████████

███████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

[REDACTED] Leveraging these tools, Brinks Home was able to significantly streamline and improve the efficiency of its business, drive down the rate of customer attrition, reduce call center interactions, and cut down servicing costs. One of the confidential presentations [REDACTED] highlighted ways in which Brinks Home developed and deployed some of the key features of Go Fast going back to 2020. Under the header "Brinks Home Transformation: Improve Retention & Customer Experience," Brinks Home outlined its multi-year development arc for Go Fast, beginning with implementation of a machine learning solution for customer retention in 2020 and showing the launch of other aspects of the strategy between 2021 and 2024.

20.     Since implementing Go Fast, Brinks Home experienced the following changes in its business:

9

- Reduced attrition (measured by recurring monthly revenue) from 15.9% in 2020 to 10.4% in 2024;

- Reduced phone calls from 3 million per year in 2020 to 1.4 million per year in 2024;

- Reduced truck rolls (meaning instances where a representative visits a customer's residence to provide service) from 105,000 in 2020 to 37,000 in 2024; and

- Increased digital interaction (meaning the percentage of customers using Brinks Home's web- or app-based self-service functions) from 8% in 2020 to 57% in 2024.

21. Given the value to its business, Brinks Home closely guarded the Go Fast methodology and implemented various practices to safeguard this information, including, among other things, password-protecting certain strategic documents, granting technical access to a limited number people, requiring all of the vendors involved to agree to maintain information as confidential, and even requiring key vendors to agree not to provide services to a competitor because providing services in the manner developed by Brinks Home could indirectly reveal aspects of Go Fast.

**B.    As ADT Struggles To Grow Its Business, ADT Seeks A Shortcut to Innovation By Stealing Information From Brinks Home**

22. While Brinks Home's performance has continued to improve in recent years, ADT's key performance indicators have not materially improved, and

10

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

subscriber growth has declined.  As of June 2024, ADT's three-year earnings before interest, taxes, depreciation, and amortization (EBITDA) growth rate was negative 4.3%, while its five-year EBITDA growth rate was negative 4.8%.  ADT also struggled to convert its revenues into profits, with roughly flat or declining gross margin over each of the past five years.  At the time of its initial public offering ("IPO") in early 2018, it had approximately 7.2 million customers; it has roughly 6 million customers as of today.

   **1.**  **ADT** ██████████████████ **Unlawfully Obtain And Exploit Brinks Home Confidential Information**

23. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

24. ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

25.

26.

27.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.



28.

29.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

---

[2] Net Promoter Score (or "NPS") is a metric used to gauge customer loyalty and predict business growth. It is calculated by asking customers how likely they are to recommend a company (or a specific product or service) on a numeric scale. The highest scores are considered promoters, the middle scores are considered neutrals, and the lowest scores are considered detractors. NPS is calculated by subtracting the percentage of detractors from the percentage of promoters.

14

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.



30.

31.

32.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.



33.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.



34.

35.

36.

Even within Brinks Home, the details about how Go Fast was designed and operated were known only by a limited set of employees, all of whom were obligated as one of the terms of their employment to keep this information confidential.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

37.     As previously explained, "Go Fast" refers to a comprehensive strategy Brinks Home developed to leverage advances in technology and artificial intelligence to transform its business and improve unit economics. █████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

38.     █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

39.     █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████

40.    ████████████████████████████████████

████████████████████ This medallion architecture, sometimes referred to as "multi-hop" architecture, refers to a data design pattern used to logically organize vast quantities of data in a warehouse. The BH Data Lake contains three "medallions" – bronze, silver and gold – each representing a different step in the process of harvesting data about Brinks Home's customers. The first or "bronze" stage involves ingesting raw data from a variety of data sources. A key aspect in the design of a data lake or data warehouse is making sure that enough data is ingested to support necessary output applications while also not overloading the data lake with excess data that will make it unworkable. Through more than five years of trial and error, Brinks Home identified a proprietary mix of data inputs most relevant to predicting customer attrition and retention strategies. ████████████████████

██████████████████████████████████████████

████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

41.     The second or "silver" stage of the BH Data Lake involves refining

the data in several ways. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ Through

more than five years of trial and error, Brinks Home identified a proprietary mix of

data sets most likely to yield this information. Brinks Home also invested substantial

time and attention to developing the programing code for implementing this process.

████████████████████████████████████████████████████

██████████████████████████████████

42.     The third or "gold" stage of the BH Data Lake contains the most

refined view of the data and allows for direct use by Brinks Home business leaders

and input into a variety of other applications. ████████████████████████

████████████████████████████████████ the below graphic to illustrate

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

the various layers of the BH Data Lake and serve as a guide for the detailed discussions about each layer.

43.

various proprietary ways that Brinks Home leverages the BH Data Lake and certain customized software applications to improve its business results.

44. First, with regard to customer retention,

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

45. Second, Brinks Home ▮▮▮▮▮▮▮ its proprietary processes for how it identifies the retention offers it makes to each customer based on this data. In particular, Brinks Home described its use and customization of software developed by OfferFit, Inc. ▮▮▮▮▮▮▮▮▮▮▮▮▮

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████ so that Brinks Home can

continuously refine which offers are most likely to result in retention of which

customers. Knowledge of the specific methodologies and processes used by Brinks

Home were not known and would have been extremely valuable to Brinks Home's

competitors.

46. Third, Brinks Home also ███████████ how it has deployed

software created by Cresta Intelligence Inc. as part of this Go Fast strategy. ██████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████ █

███████████████████████████████████████

███████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

47.     Each of Brinks Home's arrangements with Vosiq, OfferFit and Cresta reflected the proprietary nature of the work being done because they provided a roadmap to Brinks Home's highly customized use of these applications. ████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████[3] These documents—which were updated over time as Brinks Home continued to develop Go Fast through years of trial-and-error—listed, among other things, the data sources that would be fed into Voziq's software, the specific fields that were extracted from those sources, the frequency of extraction, the models that each data source supported, the precise

---

[3] These documents were ████████████████████████████████

████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

reports Voziq would generate, and the data that would be fed back to Brinks Home. These documents also included detailed process flowcharts that would allow ADT to replicate Brinks Home's process. These excerpts ███████████████ ███████████ illustrate both the data exchange process and the overall data ecosystem that Brinks Home used to develop its proprietary models and other customer service functions that were part of Go Fast.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.



48. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ how it designed

and deployed its customer portal and integrated it with other applications to increase

self-service capability.  In particular, ████████████████████ how the

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

account management and chat functions available through those applications reduced the number of live customer interactions, which in turn improved customer satisfaction while reducing cost-to-serve.

49. ███████████████████████████████████████

███████████████████████ the substantial benefits it has realized from its investment in the Go Fast strategy, including but not limited to:

- Reduced call center interactions from 4 million to 1 million per year;

- More than doubled the percentage of customer interactions that occur via digital channels rather than telephone from 21% in 2021 to 54% as of 2024 YTD;[4]

- Reduced customer attrition, measured by recurring monthly revenue, from 17 percent in 2019 to roughly 10 percent for 2024 YTD;

- Implemented price increases without discernable impact on customer attrition, which enabled an increase in operating margin from 48.6% in 2021 to 60% for 2024 YTD;

- Increased net promoter scores (i.e., the likelihood that a consumer will promote a particular business) from 16 in 2021 to 40 in 2023 and 51 for 2024 YTD; and

- Reduced employee turnover (which, again, helps reduce cost-to-serve by reducing hiring and training costs and improving customer interactions based on the accumulated experience of each employee) from 77.5% in 2021 to 31.3% in 2024 YTD.

50. ███████████████████████████████████████

███████████████████████████████████████

---

[4] "2024 YTD" data presented in this paragraph was year-to-date through June 2024 ███
███████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

[REDACTED]

51. As a competitor, ADT would not have access to this proprietary information, much less in such detail, in the regular course of its business. ▉

[REDACTED]

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

**2. ADT Reverses ███████████████████████ Immediately Begins Using Brinks Home's Proprietary Information**

52. ████████████████████████████████████████

████████████████████████████████████, ADT quickly moved to misappropriate these ideas for its own business ██████████████████

██████████████████████████████

53. On August 1, 2024, ADT held an earnings call to discuss its results for the second quarter of 2024 and provide the market with an update about its business plans going forward. With regard to technology development, ADT announced that it was just starting to implement programs very much like ████████████████

████████████████ Ahead of this call, ADT issued a written statement reporting that its "[e]arly efforts" would focus on "implementing AI in customer care operations and customer retention programs." And on the earnings call later that same day, when asked whether ADT was "still at early stages" in developing its AI opportunities, ADT's CEO Jim D. DeVries acknowledged that was the case, explaining that ADT's "first opportunity [to leverage AI] lies in customer care," the impact of which they did not expect to see until later in the year. ADT further explained that the second opportunity—in "propensity modeling, propensity to churn modeling"—would not be implemented until the following year (i.e., 2025). These are the exact Go Fast programs supported by the proprietary processes Brinks

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

Home ████████████████████. DeVries then eliminated all doubt that ADT only recently decided to pursue these programs and that they would not actually launch until next year, saying "[i]n terms of financial impact, I think that's more '25 than it is '24." ADT's Executive Vice President and Chief Business Officer Wayne Thorsen—████████████████████████████████████████ —even went so far as to assure investors that the programs would be successful because "there are numerous examples where people have reached very significant deflections [i.e., reductions in calls to call centers] using these same products." ████████████████████████████████████

████████████████████████████████████████

54. ADT's August 1 announcements reflected a pivot in its AI strategy. Until that point, ADT had been focused on leveraging AI in its "hard product" (i.e., the home security systems and accessories installed in customers' homes) via a partnership with Google. This announcement marked the first time that ADT was shifting focus to using AI/ML technology to reduce call volumes, reduce customer churn, and improve employee retention, all in order to generate materially more free cash flow from its existing portfolio of customers. In other words, ██████████████

████████████████████████████████████████

████████████████████████████████ ADT turned around and

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

announced that it would implement a clone of this strategy, relying on the use of Brinks Home's trade secret, confidential, and proprietary information.

55. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

56. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

57. Upon information and belief, and taking these facts together with the benefit of hindsight, it appears that ADT ████████████████████████████

████████████████████████████████ from its major competitor and, in particular, information that would improve its operating metrics through the use of Brinks Home Go Fast platform.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

58.     Although some aspects of Brinks Home's technology development may be relevant to the two metrics ADT identified as most important—i.e., customer retention and cost-to-serve—██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

59.     ADT's actions are intentional.  At all relevant times, ADT knew that it did not have any right or license to use the above-mentioned information for its own purposes, █████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

### 3.     ADT Has Profited By Cloning Brinks Home's Go Fast Program

60.     On October 24, 2024, ADT held another earnings call to update investors and analysts about its business.  During this call, ADT's Thorsen said that ADT launched a "pilot" program "last week" with a company known as sierra.ai, which Thorsen described as a "conversational AI platform" that ADT was using to handle customer service interactions.  In other words, ████████████████████

████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

█████████████████████████████████████, including the key contracts and other operational data, ADT took Brinks Home's time-tested processes and asked another vendor to clone them.

61. On April 24, 2025, ADT held another earnings call to update investors and analysts about its business. During this call, ADT's DeVries responded to an analyst's question about customer attrition (or churn) by touting "new initiatives underway that give us some optimism," including efforts of "being more proactive with at-risk customers." This appears to be a direct clone of the Predictive Churn Model and OfferFit aspects of Go Fast that Brinks Home ████████████████████ ████████████████████ During ADT's July 24, 2025 earnings call, DeVries also mentioned that ADT's "AI efforts remain focused on our customer care operations" and that ADT was utilizing AI to improve "the customer service experiences for both our ADT customers and our employee agents while also improving overall efficiency." This appears to be a direct clone of the AI-assist functions of Go Fast that allow Brinks Home customer service representatives to resolve customer inquiries quickly and effectively, thereby improving efficiency.

62. In the written materials distributed that same day, ADT touted several improvements to its financial performance based on the initiatives it modeled after Brinks Home's Go Fast strategy. For instance, ADT noted that although its customer count was flat year-over-year, its financial performance was buttressed by (i) an

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

increase in recurring monthly revenue due in part to "higher average pricing" and (ii) a lower attrition rate driven by "[r]etention initiatives and customer service focus." These and other improvements in ADT's business and financial performance are a direct result of ADT misappropriating the trade secrets that constitute Brinks Home's Go Fast program. ████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████ ADT obtained all the information it needed to replicate that process and has now been using it for its own benefit.

63.     ADT is now positioned to realize substantial and unjust benefits from its misappropriation of Brinks Home's trade secrets.  In addition to saving the tens of millions of dollars that Brinks Home invested in developing Go Fast, ADT will now realize material improvement to its business by deploying the strategies Brinks Home developed. ████████████████████████, if the Go Fast strategy was deployed competently, it would materially improve ADT's free cash flow by hundreds of millions of dollars through lower churn, higher customer satisfaction, and better operating margins and pricing.

### FIRST CAUSE OF ACTION
**(Breach of Contract – Misuse of Information)**

64.     Brinks Home incorporates by reference the allegations in paragraphs 1 through 63 as if fully set forth herein.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

65. █████████████████████████████████████████

████████████████████████████████████████  ███████████████

██████████████████████.

66. █████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

67. ADT misappropriated these trade secrets, has used, and continues to use this information—without authorization and in violation of its obligations that it knew or had reason to know created an obligation to limit the use of such information—to launch its own AI-powered platform to achieve lower customer attrition and increased customer retention, giving it the benefit of Brinks Home's years of research and strategic development.

68. █████████████████████████████████████████

████████████████████████

69. On the other hand, Brinks Home performed all of its ████████████

████████████████████████████████

70. Brinks Home has suffered, and continues to suffer, damages and irreparable harm █████████████████████████████████████████

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

## SECOND CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1))

71.    Brinks Home incorporates by reference the allegations in paragraphs 1 through 70 as if fully set forth herein.

72.    As described above, Brinks Home's proprietary information includes intellectual property and trade secrets that make up its Go Fast platform, and its confidential and proprietary application of certain AI tools, including Voziq, OfferFit, and Cresta. Brinks Home's proprietary information further includes, but is not limited to:

- Business methods and strategies, including those built from the collection and analysis of data and information, and iterative development derived from that process, for the retention and servicing of Brinks Home customers;

- The underlying data and information collected by Brinks Home in the course of using AI-powered tools, including the type, nature and uses of such information;

- Compilations and analyses of such data and information, including the selection of data and information from those proprietary sources; and

- Quantitative and qualitative validation of the above business methods and strategies.

73.    The above-mentioned proprietary information constitutes "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

74.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████    Those trade secrets provided ADT with business methods and

36

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

strategies, validating information and data, financial information, and marketing and pricing algorithms.

75. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

76.     Brinks Home is the "owner" of the above-mentioned proprietary information, as defined under 18 U.S.C. § 1839(4).

77.     Brinks Home has invested substantial resources in developing and protecting the proprietary information, which provides Brinks Home with economic and technical advantages over its competitors.

78.     ADT knew or should have known that the information at issue comprised Brinks Home's proprietary information. ███████████████████

███████████████████████████████████████████████

███████████

79.     The above-detailed trade secret and confidential information derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Brinks

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

Home's competitors, or to other persons or entities who might obtain economic value from their disclosure or use.

80.     Nevertheless, ADT has misappropriated Brinks Home's proprietary information by using it for purposes █████████████████████████████

██████████████████

81.     ADT misappropriated these trade secrets, has used, and continues to use this information—without authorization and in violation of its obligations that it knew or had reason to know created an obligation to limit the use of such information—to launch its own AI-powered platform to achieve lower customer attrition and increased customer retention, giving it the benefit of Brinks Home's years of research and strategic development.

82.     ADT's misappropriation has proximately caused damage to Brinks Home, including but not limited to loss of profits, goodwill, competitive advantage, and business opportunities.

83.     ADT's actions in misappropriating Brinks Home's trade secret and confidential information was willful, fraudulent, malicious, and was done with the intent to injure and oppress Brinks Home and improve ADT's own economic opportunities, thereby justifying an award of punitive damages against ADT pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

84.     Brinks Home is also entitled to injunctive relief to protect its confidential information and trade secrets by enjoining ADT from any disclosure or use of Brinks Home's proprietary information.

**THIRD CAUSE OF ACTION**
**(Violation of Texas Uniform Trade Secrets Act,**
**Tex. Civ. Prac. & Rem. Code §§ 134A.001 et seq.**
**or Delaware Uniform Trade Secrets Act, 6 Del. C. §§ 20 et seq.)**

85.     Brinks Home incorporates by reference the allegations in paragraphs 1 through 84 as if fully set forth herein.

86.     As described above, Brinks Home has developed and is the owner and possessor of proprietary information consisting of valuable trade secrets, including, but not limited to:

- Business methods and strategies, including those built from the collection and analysis of data and information, and iterative development derived from that process, for the successful retention of Brinks Home customers;

- The underlying data and information collected by Brinks Home in the course of using AI-powered tools to retain customers, along with information gathered from its customers;

- Compilations and analyses of such data and information, including the selection of data and information from those proprietary sources as well as public data as relevant to the retention of Brinks Home customers; and

- Quantitative and qualitative validation of the above business methods and strategies.

87.     ███████████████████████████ Brinks Home provided ADT access to its valuable trade secrets.

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

88.     At all relevant times, including in the course of its interactions with ADT, Brinks Home carefully guarded the trade secrets at issue, ██████████ ██████████████████████████ and other confidentiality measures with ADT. Those measures and Brinks Home's other conduct constitute reasonable efforts for maintaining the confidentiality of Brinks Home's trade secrets.

89.     Brinks Home has invested substantial resources in developing and protecting the proprietary information, which provides Brinks Home with economic and technical advantages over its competitors.

90.     ADT has misappropriated Brinks Home's proprietary information by using it for purposes ███████████████████████████████████

91.     ADT misappropriated these trade secrets, has used, and continues to use this information—without authorization and in violation of its obligations that it knew or had reason to know created an obligation to limit the use of such information—to launch its own A.I.-powered platform to achieve lower customer attrition and increased customer retention, giving it the benefit of Brinks Home's years of research and strategic development.

92.     As a direct and proximate result of ADT's misappropriation, Brinks Home has suffered damages in an amount to be proven at trial. Brinks Home will continue to be irreparably damaged unless ADT is enjoined from future use and

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED
EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

disclosure of Brinks Home's trade secret information, for which future harm Brinks Home has no adequate remedy at law.

93. ADT's acts of misappropriation of Brinks Home's trade secret information were and continue to be willful and malicious, warranting an award of exemplary damages and an award of attorneys' fees as provided by Tex. Civ. Prac. & Rem. Code §§ 134A.004, 134A.005.

94. Brinks Home is also entitled to injunctive relief to protect its confidential information and trade secrets by enjoining ADT from any disclosure or use of Brinks Home's proprietary information.

## FOURTH CAUSE OF ACTION
### (Common Law Unfair Competition)

95. Brinks Home incorporates by reference the allegations in paragraphs 1 through 94 as if fully set forth herein.

96. Brinks Home and ADT compete for a common pool of customers. Both market security, automation, and smart-home services to the same target market of residential customers.

97. ADT has engaged in common law unfair competition by stealing Brinks Home's proprietary information ████████████████████ ████████████████ The Defendants' actions are contrary to honest practice in industrial or commercial matters. They are also prohibited by the alarm industry's own code of conduct.

41

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

98.     Brinks Home has suffered, and continues to suffer, damages and irreparable harm as a result of ADT's unfair competition.

99.     ADT's actions are knowing and willful.

100.    Accordingly, the Court should award punitive damages in an amount sufficient to deter ADT from continuing to engage in unfair competition in the market for electronic security services.

## **PRAYER FOR RELIEF**

WHEREFORE, Brinks Home respectfully requests that the Court enter judgment in its favor and award the following relief:

a.  An injunction against ADT's continued use and misuse of Brinks Home's proprietary information;

b.  An order compelling ADT to specifically perform its obligation █████ ███████████████████████████ by returning to Brinks Home all of Brinks Home's proprietary information in its possession, custody, and control, and to purge all such proprietary information (including all derivatives of such proprietary information) from its computers and other locations under its control;

c.  Compensatory damages, in an amount to be established at trial;

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

d. A reasonable royalty for a misappropriator's unauthorized disclosure and use of ADT's proprietary business information, including pursuant to 18 U.S.C. § 1836(b)(3)(B);

e. Exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), Tex. Civ. Prac. & Rem. Code § 134A.004(b), and/or 6 Del. C. § 2003;

f. Attorneys' fees and costs incurred in the prosecution of this action, including pursuant to 18 U.S.C. § 1836(b)(3)(D), Tex. Civ. Prac. & Rem. Code § 134A.005, and/or 6 Del. C. § 2004;

g. Pre- and post-judgment interest; and

h. Such other and further relief as the Court may deem appropriate in the circumstances.

ROSS ARONSTAM & MORITZ LLP

*/s/ Garrett B. Moritz*

Garrett B. Moritz (Bar No. 5646)
Roger S. Stronach (Bar No. 6208)
Hercules Building
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600
gmoritz@ramllp.com
rstronach@ramllp.com

*Of Counsel:*

Matthew S. Salerno
Jason C. Hegt
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020

*Attorneys for Plaintiff BH Security LLC
d/b/a Brinks Home Security*

Dated: September 24, 2025

43

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR BY COURT ORDER.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| BH SECURITY, LLC d/b/a BRINKS HOME SECURITY, | |
| Plaintiff, | |
| v. | C.A. No. 2025-_____-___ |
| ADT Inc. and ADT LLC, | |
| Defendants. | |

## <u>VERIFICATION</u>

STATE OF _Texas_ )
                    )  SS:
COUNTY OF _Dallas_ )

I, Philip Kolterman, being duly sworn, depose and say as follows:

1.     I am Senior Vice President and Chief Information Officer at BH
Security LLC d/b/a Brinks Home Security ("Brinks Home").  I am authorized to
make this verification on behalf of Brinks Home.

2.     I have reviewed the foregoing Verified Complaint.

3.     The factual statements in the Verified Complaint insofar as they relate
to Brinks Home's acts and deeds are true, and insofar as they relate to the acts and
deeds of any other person are believed by Brinks Home to be true.

Philip Kolterman

SWORN TO AND SUBSCRIBED before me
this 24 day of September 2025.

Notary Public

My Commission Expires: 11/01/2028

JANET MICHELL THOMPSON
Notary Public, State of Texas
Comm. Expires 11-01-2028
Notary ID 129187468

2